UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:20-CV-103

DAVID LUTZ, on behalf of himself and
all others similarly situated.

Plaintiff,

v.

CASE FARMS, LLC,

Defendants.

**VERIFIED CLASS ACTION COMPLAINT**
**(JURY TRIAL DEMANDED)**

COMES NOW, the Plaintiff, David Lutz, on behalf of himself and others similarly situated, and file this Class Action Complaint against the Defendant, Case Farms, LLC for violation of the federal Packers and Stockyards Act of 1921, and federal Declaratory Judgment Act, as well as willful breach of contract, declaratory judgment, fraud, negligent misrepresentation, temporary restraining order and preliminary injunction, violation of Chapter 75 of the North Carolina General Statutes, tortious interference with Contract, and defamation. Plaintiff seeks compensatory damages, treble damages or punitive damages, interest, attorneys' fees, costs, and injunctive relief prohibiting Defendant's continuing wrongful conduct.

## PARTIES

1.      Plaintiff, DAVID LUTZ, is an individual and citizen and resident of Lincoln County, North Carolina.

2.      Defendant, CASE FARMS, LLC, is a North Carolina limited liability corporation, with its principal place of business in Troutman, North Carolina, in Iredell County, North Carolina.

1

## JURISDICTION AND VENUE

3.     Plaintiff's federal claims arise under the Packers and Stockyards Act, 7 U.S.C. § 181, et seq. and federal Declaratory Judgment Act, 28 U.S.C. § 2201 and 2002.[1]  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331, and 7 U.S.C. §§ 209.

4.     This Court has supplemental jurisdiction over pendant claims arising under North Carolina law pursuant to 28 U.S.C. §1367.

5.     This District is proper venue under 28 U.S.C. §1391 because all of the parties are residents and domiciled in this District and the events in this lawsuit, concerning Case Farm's illegal contract with Plaintiff, and illegal termination of that contract, and Defendants' defamation of Plaintiff, all occurred in this District as well.

## FACTUAL ALLEGATIONS

6.     Defendant Case is a large poultry dealer, slaughtering and shipping for consumption, millions of pounds of chicken each week.

7.     Case operates as what is known as an "integrator." It controls each and every aspect of raising chickens, slaughtering them, and selling their meat.  Case's various chicken meat products come from broilers-chickens genetically altered to produce so much breast meat that their bones often cannot properly support their body-that are born in Case's hatcheries, from eggs laid by Case's hens, and which remain Case's property throughout their entire lives. The broilers are grown on feed formulated and provided by Case, in conditions regulated by Case. Each bird is allotted less than one square foot of space in the broiler houses. Additionally, the broilers are treated by veterinarians hired by Case, according to Case's standards and rules.  They are slaughtered on the date Case selects, in Case's plants, and where Case's employees evaluate the

---

[1] Plaintiff acknowledges that the federal Declaratory Judgment Act is not an independent source of federal jurisdiction.

birds to determine whether they are fit for human consumption. If so, they are sold based on Case's pre-existing contracts with various purchasers.

8. In this system, so-called farmers/independent contractors like the Plaintiff are known as "growers." They grow the broilers based upon contract terms dictated by Case. Growers, including Plaintiff, cannot negotiate the terms of these contracts, are told they "must" sign them there on the spot, without consulting legal counsel, and are not given copies of such contracts at the time of signing nor until years later if at all. Thus, these contracts are contracts of adhesion.

9. Under these dictated contracts, the growers bear virtually all the risk. They are responsible for building and maintaining the facilities on their farms in which the broilers are cared for, relying on Case's false representations regarding its commitment to its growers and their future earnings. They are required by Case to take out massive loans, using documentation prepared by Case for the loan applications. Typically, these loans are guaranteed by the United States taxpayer, for which they are personally responsible. In return, Plaintiff are paid based on a "tournament system," in which all growers whose chickens are slaughtered within a given time period compete with one another.

10. Case disguises its virtual control of the outcome of the tournament through calculating the ranking of each grower to the ten-thousandth of a percent by averaging the so-called efficiency of a grower's production in the tournament instead of providing the growers with the outcome of each house even though Case has this information available. The top producing growers - as solely determined by Case - are paid a premium over and above a so - called "base price," and the lower ranked growers are subjected to offsetting discounts or deductions below the "base price." This is "robbing Peter to pay Paul".

11. This tournament system ensures that Case's costs are consistent, but the growers can neither predict nor control their pay. Indeed, Case so dominates the growers that the growers are in effect "maintenance workers" or "sharecroppers" for Case. Growers, like Plaintiff, take out millions of dollars in loans to build their farms to Case's specifications, and then have no way to repay such loans other than to do exactly as Case says, without ever voicing objection, or risk financial ruin and bankruptcy, as happened to Plaintiff.

12. Case controls all of the aspects of genetics, nutrition, health and virtually all aspects of the environment in the grow-out process. In all probability, the growers may influence two percent 2% of these aspects in the grow-out process. Case literally controls its broiler production process from the egg to the plate. Through the illegal contracts of adhesion that it imposes on growers, Case controls the following aspects of the grow-out process, all of which directly impact the weight of the chickens at the end of the grow-out process, and thereby the amount of remuneration the grower receives from Case.

   a. Case unilaterally controls the drafting, language and terms of the poultry growing agreement.

   b. Case controls the type and condition of the houses required on a grower's farm.

   c. Case controls the contractors who are permitted to construct houses on a grower's farm.

   d. Case controls the type and condition of the equipment required on a grower's farm.

   e. Case controls whether or not upgrades (improvements) are required on a grower's farm.

   f. Case controls the condition of the grower's farm adjacent to the poultry houses.

   g. Case controls the required maintenance of the land around the poultry houses.

4

h.  Case controls the type and kind of animals allowed on a grower's farm.

i.  Case controls the type of pest control allowed on a grower's farm.

j.  Case controls the genetics of the birds and the sex of birds delivered to growers' farms.

k.  Case owns and/or controls the pullets that are used to produce laying hens.

l.  Case owns the laying hens that produce the broiler eggs hatched by the laying hens.

m.  Case owns the eggs that are hatched by the laying hens.

n.  Case owns and controls the hatchery where the eggs are hatched.

o.  Case owns the broiler chicks that are hatched.

p.  Case controls the medication for the eggs and birds and the administration of the medication.

q.  Case controls the type of birds that each grower is given.

r.  Case controls the health and condition of the birds delivered to a grower.

s.  Case formulates and owns the feed provided to growers and its nutritional value.

t.  Case controls the additives included in the feed.

u.  Case controls the type of feed delivered to a particular grower and timing of changes to the feed ration for that grower's chickens.

v.  Case controls if a grower gets reclaimed (old) feed.

w.  Case determines when the birds will be delivered to a grower.

x.  Case controls whether a grower receives veterinary services.

y.  Case controls when veterinary services are provided on the grower's farm.

z.  Case controls when and which birds must be killed (culled) by a grower.

aa. Case controls the service technician that oversees each grower's farm.

bb. Case controls the environment the birds are grown in.

cc. Case controls the temperature of the poultry houses the birds are grown in.

5

dd. Case controls the airflow of the poultry houses the birds are grown in.

ee. Case controls the lighting of the poultry houses the birds are grown in.

ff. Case controls when the birds will be picked up for processing.

gg. Case controls the "catch crew" which picks up the birds for processing.

hh. Case controls the transporting of the birds to the processing plant.

ii. Case controls the weighing of the birds.

jj. Case controls the amount of time between catching the birds and weighing the birds.

kk. Case controls the amount of time between weighing the birds and processing the birds.

ll. Case even controls the disposal of the excrement of its birds.

mm. Case controls the condition and environment of the farm and poultry houses before new flocks will be delivered to the grower's farm.

nn. Case controls how long growers are held out between flocks.

oo. Case controls how many flocks a grower receives.

pp. Case controls the tournament system and income of the growers.

qq. Case controls recording of factors (weight, etc.) that determine a grower's income, without a grower having proper means of verifying the numbers alleged by Case.

rr. Case controls whether a grower's flock is excluded from the tournament thereby affecting all growers' pay.

ss. Case controls whether a grower's flock gets an exception thereby affecting all growers' pay.

tt. Case controls which growers are ranked against each other.

13. Under this one-sided arrangement, the growers are subject to the strict and unrelenting control of every detail by Case. The only thing a grower can truly call his/her own is the extensive debt that is accumulated as a direct result of meeting Case' strict demands.

6

14.     As all local growers working for Case are required to do, Plaintiff entered into an unconscionable adhesion grow-out contract with Case titled "Broiler Production Agreement".

15.     Once the growers receive the chicks they care for the chicks for approximately 60 days or 8.5 weeks depending on Case's required weight of the bird at the end of the grow-out process.

16.     Case is easily able to exert such control and enforce such unconscionable arrangements because it is virtually the only broiler integrator to which the local growers can turn. There is virtually no other viable option, especially when Case defames and lies to the community about a farmer, as Plaintiff has been painfully made aware since Case unlawfully terminated the poultry growing arrangement. The Production Agreement gave Case monopoly power over Plaintiff and all the other growers by entangling them in Case' archaic, abusive and unconscionable payout system, better known throughout the industry as the "tournament system."

17.     This scheme benefits Case in many ways.  Case is able to exercise all the control that an employer would exercise over an employee, but with none of the responsibility.  Case does not have to pay the grower minimum wage or overtime nor is it subject to the North Carolina Wage and Hour Act; can literally require the grower to be on call 24 hours a day, seven days a week; is not responsible for workers compensation or unemployment insurance; is not liable under Title VII or the North Carolina law for discrimination claims; and, can force the grower to bear all the costs of building and equipment maintenance and any upgrades it sees fit to require, as here where Plaintiff was forced to take out burdensome loans just to pay for the privilege of caring for Case's chickens.

18.     The compensation for growers such as Plaintiff is meted out according to the so-called "tournament system."  Plaintiff was ranked against other Case growers whose flocks were

also processed in the same period, based upon the "Marketable Broiler Live Weight" (basically the weight of the chickens when fully grown), divided by the "Weighted Average Formula Cost" (the cost of feed and medication Case had to supply to care for the chickens). Presumably, this tournament system should start with a level playing field for all the growers, but such is not the case. The values upon which the tournament system is based are in no small part determined by the quality of chickens, feed and medicine provided by Case to the individual growers.

19. Case defrauded Plaintiff through the tournament system and subjected Plaintiff to unlawful practices by unilaterally imposing and utilizing a ranking system that can be, and in fact was, arbitrarily and capriciously manipulated. By ranking individual growers, including Plaintiff, Defendant wrongfully pits each grower against the other, arbitrarily punishing what Case deems to be a less successful grower based upon criteria which are virtually under the total control of Case, and which are never revealed, explained or discussed with the growers.

20. The tournament system is designed to increase Case's profits at the expense of, and to the severe detriment of, its growers, including Plaintiff, and thereby decreasing the profits of its growers, including Plaintiff. Case defrauded Plaintiff by unilaterally imposing and utilizing the tournament system, which wrongfully placed Plaintiff in competition with their fellow growers, all the while requiring Plaintiff to accept chicks that are genetically different, and chicks in varying degrees of health. Likewise, the feed supplied by Case is of dissimilar quantity, quality and consistency, and is often delivered inappropriately and in an untimely manner. Plaintiff was ranked against each of the other growers even though they possessed dissimilar facilities, equipment and technology. Additionally, Plaintiff received differing degrees of technical assistance and was required to comply with management practices that were inconsistent with his fellow growers.

21.    The end result of the tournament system is the imposition of an arbitrary and capricious ranking of each grower, which is designed to insure Case's ability to wrongfully control its cost of operations at the expense of its growers, including Plaintiff, and to maintain undue financial dominance over Plaintiff and their fellow growers.  Under this arbitrary and capricious system a chicken grower can rank at the top of his group for one flock, and then just eight weeks later, using the exact same animal husbandry practices, rank at the bottom of the group for the next flock.

22.    Despite its arbitrary internal ranking system, Case receives the same sale price for its comparable products sold no matter the type of facilities and equipment that were located on the farm where the chickens were cared for.  Case's tournament system is the classic "rob Peter to pay Paul" scenario that is unfair, unjustly discriminatory and deceptive, as well as unduly and unreasonably prejudicial and disadvantageous to Plaintiff and their fellow growers.

23.    Case has and continues to fraudulently conceal from said growers, including Plaintiff, material facts regarding the detrimental effect to said growers, including Plaintiff, resulting from the tournament system.

24.    The key variables that determine growers' scores, ranking, and ultimately, their compensation, are entirely under Case's control and therefore subject to manipulation without detection by the growers, enabling Case to artificially depress a particular grower's payout, and which it did manipulate, in fact, to artificially depress Plaintiff's payouts.

25.    The inequity of the tournament system was exposed in an online poultry publication article about a study done by the Poultry Science Association discussing the importance of certain determinative factors involved in the broiler grow-out process.

9

26. The Poultry Science Association ("PSA") was established in 1908. According to its webpage, https://www.poultryscience.org, the PSA is a professional organization consisting of approximately 1,800 educators, scientists, extension specialists, industry researchers, administrators, producers, and college students who are committed to advancing the poultry industry. Since 1908, PSA has maintained a level of prestige that ranks it among the top professional organizations in the field. For over a century, PSA's member scientists have contributed through their research to the progress of the poultry industry and the development of safer and more nutritious food products for the consumer. Throughout this period, PSA has served - and it continues to serve - as the premier clearinghouse and publisher of basic and applied poultry research in the world. The application of research findings published in PSA's journals has been and remains a major contributor to the rapid growth and maturation of the meat and egg industries. In addition, poultry-related research has made substantial contributions to the overall understanding of human health and nutrition. Its webpage lists its objectives as follows:

k. To stimulate the discovery, application and dissemination of knowledge.
l. **To create a forum for the exchange of information among various segments of the poultry industry.**
m. **To publish original research, reviews and timely information in the official PSA publications: Poultry Science® and the Journal of Applied Poultry Research.**
n. **To recognize outstanding professional achievement.**

27. In July of 2011, the PSA sponsored a symposium in St. Louis addressing the future of the poultry industry, hot topics of current economics, and questions surrounding the future of food agriculture. Experts in poultry science examined the fields of genetics, nutrition, hatchery management, vaccination/immune modulation, coccidiosis control and antibiotic use. It was discussed and reiterated in an article written by Christine Alvarado, Ph.D., a Professor at Texas A & M University and published by WATT Ag Net.com,

10

https://www.wattagnet.com/articles/10194-genetics-plays-large-role-in-poultry-industry-s-future. Portions of her article stated as follows:

> "The reason the industry has been so successful is improvements in genetic potential of breeds to achieve efficient production standards with proper nutrition, environmental management and health. Based upon the overall conclusions of the symposium, genetics is critical to the successful future of the industry. According to Leeson, genetics account for 90% of the current and future status of the poultry industry, while the remaining criteria of nutrition (5%), environment (3%) and health (2%) are considered supporting roles."

28. Although Case controls at least 98% of the of the grow-out process it ranks growers as if they alone determine the outcome of the grow-out process thereby shifting all of its economic risks in the grow-out process to the growers thereby using the tournament system (settlement) as an unfair, unjustly discriminatory and deceptive rigid cost controlling device. This allows Case to pay its growers in a manner that causes huge swings in the amount of compensation each grower receives in any given settlement. This is done even though there are countless variables controlled by Case that exist between the inputs into the grow-out process on each grower's farm.

29. Not surprisingly, the federal government recently also determined that poultry farmers, like the Plaintiff, lack the independence needed to justify the award of small business loans. In the Executive Summary of a March 2018 report entitled, "Evaluation of SBA 7(A) Small Business Administration Loans to Poultry Farmers," the Inspector General of the Small Business Administration (SBA OIG) summarized their findings:

> "We found that 7(a) loans made to growers did not meet regulatory and SBA requirements for eligibility. The large chicken companies (integrators) in our sample exercised such comprehensive control over the growers that the SBA Office of the Inspector General believes the concerns appear affiliative under SBA regulations. Specifically, in our review of a sample of 11 7(a) loans made to growers, as well as a review of defaulted 7(a) loans to growers, we found integrator control exercised through a series of contractual restrictions, management agreement, oversight inspections, and market controls. This control overcame

11

practically all of a grower's ability to operate their business independent of integrator mandates.

This control was enforced through close integrator oversight, management agreements, and grower-integrator communication. A grower's failure to comply with these requirements could result in a significant decrease in integrator payments, a reduction in flock placements, or a cancellation of the contract. A grower's economic viability was based upon a performing production contract with an integrator and is the true basis for grower income and facility value."

The report goes on to state "entities are affiliates of each other when one controls or has the power to control the other. It does not matter whether control is exercised, so long as the power to control exists." The SBA OIG went on to state that their "observation of such control was further supported by research, studies, and reports from governmental, academic, and trade publications, as well as interviews with various lenders, growers, and staff of Federal agencies and academic institutions."

30.    Plaintiff David Lutz' father acquired their family farm in Lincoln County in 1957, and Plaintiff David Lutz has farmed this land his entire life. Plaintiff David Lutz raised his family on this farm, and the land is currently home to his two daughters and their families, including his grandchildren. In 2013, Plaintiff David Lutz had preliminary conversations with Case with case managers Marvin Cumberland and Greg Chapman to build chicken houses on his family farm.

31.    In these preliminary discussions with Case managers, including Marvin Cumberland and Greg Chapman such Case managers sat at the kitchen tables of Plaintiff's home and provided Plaintiff with detailed financial projections (see Ex. "1" attached hereto), which Plaintiff provided to his bank to secure loans, secured upon title to his family farm, to initially build and equip their chicken farms. Experience has shown that these projections provided by Case were wildly incorrect. Upon information and belief, Case managers similarly sat in the homes of all growers in North Carolina, like Plaintiff, and told them to rely upon the same false

financial statements. Mangers Doug Hatley and Bradley Shore told Plaintiff the same things, again, and again, on the phone calls, and in person, in 2013 and beyond.

32.     Case Farms managers Marvin Cumberland, Greg Chapman, Doug Hatley, and Bradley Shore, have at all times known that these financial projection sheets are relied upon by growers, like Plaintiff, and his banks, in deciding whether to enter into contracts with Case. Case has known at all times that its financial projections provided to growers, like Plaintiff, are wildly incorrect, and yet does nothing to correct such financial statements nor advise or inform growers of their falsity. Upon information and belief, neither Carolina Farm Credit nor People's bank will underwrite chicken farm construction or improvement loans for Case growers because these banks find Case's financial projections to be completely unreliable, and that farmers growing chickens for Case, like Plaintiff, lose money, not make money. Case managers have known this at all times and deliberately misrepresented the opportunity for financial profit to growers like Plaintiff, as well as to banks, all of whom rely upon Case to their detriment.

33.     Plaintiff David Lutz signed his first contracts with case in 2013; attached hereto as Exhibit "2".

34.     Case managers Marvin Cumberland, Greg Chapman, Doug Hatley, and Bradley Shore told Plaintiff he had to sign his contracts without modification, were not allowed to consult with an attorney before signing, and were not provided with a copy of the contract at the time they signed them. These contracts contain no arbitration clause, provide no advance notice of termination of the contract, and no right to cure any alleged breach of contract. Upon information and belief, Case followed the same protocols for all farmers in North Carolian signing Broiler Production Agreements with Case, including such statements that they had to sign without modification, nor provided copies, nor permitted to consult with an attorney.

13

35. These same Case managers gave Plaintiff business cards of the only contractors they were allowed to use to build their farms. Copies of such business cards are attached as Exhibit "3". He was provided a construction binder specifying all aspects of construction required by Case, attached as Exhibit "4".

36. These same Case managers told Plaintiff David Lutz in 2013 that he could continue farming until he wanted to retire and then his children could continue farming with Case if they wanted; that Case had contract farmers with them more than 30 years.

37. Upon information and belief, these same Case managers made the same or similar knowingly false statements about the term and length of the Broiler Production Agreements to all growers in North Carolina in order to induce them to sign.

38. In 2016, in the process of expanding his farm, Plaintiff David Lutz was told by these same Case managers that he needed to sign a new Broiler Agreement; attached as Exhibit "5".

39. Upon information and belief, all Case growers in North Carolina signed the same form of contract from 2016 onward.

40. With respect to the 2016 contract, Case's managers including Doug Hatley and Bradley Shore told Plaintiff that they "had to sign it right now", and that it was "identical to the prior one." Specifically, this 2016 contract was laid across the hood of Plaintiff's truck, and he was told by Case managers present that "it did not matter what was in it, he needed to sign it, or he would not get any more chickens." Growers were not given any time to read it before signing, much less any opportunity to consult with legal counsel. Upon information and belief, this same protocol was followed by all Case managers in getting Case growers in North Carolina to sign the 2016 contracts.

14

41.     In fact, the 2016 Agreement was not "identical" to prior versions, and adds a new "arbitration" provision not present in the 2012 agreement. As addressed below, the 2016 agreement arbitration provision does not clearly and conspicuously identify his right to decline arbitration, nor the costs of arbitration.  It has no advance notice of termination, nor right to cure alleged breach.  Plaintiff, nor any other Case growers in North Carolina, were not provided with a copies of the 2016 agreement at the time they signed them, and indeed not until years later; even now the copies they were provided by Case are missing pages!

42.     Once a flock was delivered, Plaintiff would then care for the birds according to strict and meticulous guidelines imposed by Case.  When the flock matured, normally a sixty one day process, Case would transport the flock to its processing facility.

43.     Case managers, including Marvin Cumberland, Greg Chapman, Doug Hatley and Bradley Shore, misrepresentations that Plaintiff would continue to receive chickens was the primary inducement for them to enter into their initial agreements with Case, as well as repeating such false statements in later years to convince Plaintiff to expend funds to improve his chicken houses. A well-constructed poultry house has an average life span of approximately 30 years. However, with proper maintenance and improvements its life span can increase to 45 to 50 years. Case managers, including Marvin Cumberland, Greg Chapman, Doug Hatley and Bradley Shore, know that growers, like Plaintiff, needs fifteen (15) years just to pay off the indebtedness.

44.     Case managers, including Marvin Cumberland, Greg Chapman, Doug Hatley and Bradley Shore, knew that their representations to Plaintiff that they would continue to receive chickens as long as they grew good birds were false and misleading, and were intended to induce Plaintiff to build his facilities in 2013 and 2016, and 2017, at his expense, a precondition to Case's continuing to contract with Plaintiff.

15

45.    Case designates one of its employees to oversee the operations of a particular grower such as Plaintiff. Some of the flock supervisors/service technicians (service techs) who controlled operations of Plaintiff was Matt Lane, Kevin Martin, Tim Frankie, Daniel Beach, Joseph Perkins, and Kyle Settelmire.  Case managers including Doug Hatley and Bradley Shore, specifically said Case specifically assigned its most junior and inexperienced service men to work with its best growers.  Case, viewing Plaintiff as its best, therefore sent Plaintiff service techs who had never before worked with chickens.  Such were the "resources" made available to Plaintiff for advice and guidance.

46.    Case and its service techs and management exercised control over every aspect of Plaintiff's grow-out operation as described in paragraphs above.

47.    Case managers including Marvin Cumberland, Greg Chapman, Doug Hatley and Bradley Shore, knowingly made, and continue to make, materially false representations, both written and oral, about future income, costs, expenses, company policies and working relationships to Plaintiff, or concealed related material facts and information,  including but not limited to, the "tournament system" and the inequities related thereto to  accomplish this inducement, knowing that Plaintiff was ignorant as to the falsity of these  representations and that it would accept them as the truth and rely thereon to its own consequence and proximate injury.  Plaintiff and growers like him were required to financially encumber real and personal property and to convert its real property to a sole use thereby functionally depreciating said property and devaluing said property and rendering Plaintiff as a mere tenant, totally at the mercy of the Defendant.

48.    During the course of their relationship prior thereto, and continuing to the present Case managers, including Marvin Cumberland, Greg Chapman, Doug Hatley and Bradley Shore, materially misled Plaintiff as to the financial prospects of growing poultry for Defendant. Case

16

managers, including Marvin Cumberland, Greg Chapman, Doug Hatley and Bradley Shore, were aware that said profit projections were false and misleading when made and has been guilty of malice and bad faith in making said material misrepresentations.

49.     Case managers, including Marvin Cumberland, Greg Chapman, Doug Hatley and Bradley Shore, John Strange, and Pat Moats, have at various times altered the nutrition in the feed given to birds, without telling farmers like Plaintiff.  These changes in nutrition have effects upon the birds, causing conditions such as overheating, and increased mortality.  Such mortality increases decrease Plaintiff's profits, entirely beyond his control.  Case knows this and uses such nutrition changes as a way to exert control over Plaintiff and intentionally manipulate Plaintiff's profits.

50.     Whenever Plaintiff questioned the use of the specific feeds, such as "#4", which he saw first hand was it was killing to the birds, he was told repeated: "it is not an issue with the feed, and it is not up to you! And don't talk about the feed every again!" by Case workers.  And yet then later, Kyle Settelmire told Plaintiff, to mix the "#3" feed with the #4", and then "4" feed with "#5" feed, so it wouldn't kill the birds, agreeing that the "#4" feed was the problem!

51.     Even though per flock production remained high on Case's tournament system, beginning in December 2018, Case managers John Strange and Pat Moats began to retaliate against farmers like Plaintiff David Lutz, culminating in false statements in the community defamation, and the wrongful termination of his contract, destroying any possibility for mitigating chicken contract with another grower, with the specific malicious intent of driving them into bankruptcy, losing their family farms, to make an example of them to other Case growers in the region.

52.     Plaintiff in the summer and Fall of 2019 began experiencing increasing problems in the control asserted by Case in retaliation.  He complained to Case about these problems but

nothing was done and the retaliation got worse and worse up until Case falsely and fraudulently cancelled his contact.

53. Plaintiff called other area Case grower farmers, including Stephen Parker, and all agreed they were experiencing similar conditions, or worse, but not to complain or "Case will make an example of you and ruin you."

54. During the course of their relationship, Defendant knowingly and willfully furnished to Plaintiff substandard food for the chicks that resulted in a financial loss to the Plaintiff and other Case growers. Case delivered to Plaintiff lots of feed containing mold, to such an extent that they clogged the feeder augers. It is widely known among chicken farmers, like Plaintiff, and know by Case, that such mold in the feed causes immune systems of the birds to be weaken and allowing to disease to occur. Said actions were done knowingly and willfully and constitute bad faith on the part of said Case and in retaliation for Plaintiff's continuing complaints, and even just questions, to Case about animal cruelty and Case's breach(es) of contract.

55. During the course of their relationship, Defendant knowingly and willfully failed to provide needed medication for the chicks that resulted in a financial loss to the Plaintiff. Said actions were done knowingly and willfully and constitute bad faith on the part of said Defendant.

56. Defendant deliberately and in bad faith took certain actions that resulted in the inaccurate and deceptive weighing of chickens that resulted in financial loss to Plaintiff. These actions include, but are not limited to, giving Plaintiff fewer chickens, in such poor condition that they could not survive, including piles and piles of dead chickens, delivered dead off the truck.

57. Plaintiff was forced to put up with techs messing with his controllers without his permission or consent or knowledge. Once Tim Frankie turned on the heaters that had not been used, which resulted in a fire causing damage to the ceiling fabric. He also adjusted controller

without Plaintiff's knowledge, causing heat and exhaust fans to run at the same time resulting on a $10K waste of propane. No compensation was given for any of this.

58.     Plaintiff asked Kyle if the temperatures given by Case were set in stone because his chickens were hot.   Kyle responded, "Oh no, that's just a guideline. Make the chickens comfortable." The next visit, Kyle wrote Plaintiff up for violation not following Case temperature guidelines!

59.     Plaintiff called Case management to complain about Kyle the tech, asking if he could have another tech assigned that might help his performance.  Case manager Pat Moats got on the phone and stated, "My name is Pat Moates and all decisions I make are final and never open for discussion. Is there anything else you need?"

60.     Over and above the basic unconscionability of the Broiler Production Agreement, Case did not abide by its own terms imposed by the Agreement.

61.      In December 2019, Plaintiff asked Kyle what the plan was for houses 3 and 4 because the chickens were sick. He had not noticed they were sick and acted surprised when Pliantiff mentioned this.  He should have been aware since he is the field tech and had seen the chickens.  He stated to give them "SB" in the medicators.  Plaintiff said SB has not proven effective in the past. He said to, "run it because that's all you're gonna get!" Then the mortality rate increased daily.  Plaintiff tried several times to call Kyle without luck. Monday was a holiday.  Kyle returned later the next week and the mortality rate was explosive. We started antibiotic treatment and the numbers decreased.

62.     On February 26, 2020, Plaintiff Lutz was sent a letter by Case, that threatened to terminate his contract.  See, Exhibit "6".  Plaintiff Lutz vigorously disputed these allegations as factually incorrect, and Case managers retaliated against him.  For example, the letter of February

26, 2020 letter said that Plaintiff did not tell Case about the high mortality, but that is not true! Plaintiff did everything he was instructed to do by Kyle. Plaintif called him and tried to tell him but he did not answer, and he had said that SB was all Plaintiff was going to get anyway.

63.     During what turned out to be Plaintiff's last flock, he called Kyle Settlemyer to report that he had one-week-old chickens that were crippled and down (large amounts that were more than average). Kyle came to the farm, killed and cut open chickens, and inspected a few chickens. He diagnosed the issue as "femur head" which is a dead end of the femur, and others as "slipped ligament" syndrome. Both issues are genetic deficiencies beyond Plaintiff's control in any way or manner. These same issues continued as the chicks grew.

64.     Two to three weeks later some of Plaintiff's chickens were on their sides with extreme diarrhea. Plaintiff called Kyle to report and he came out to the farm. He diagnosed the issue as "air sac" but treated the entire flock (all houses) with amprolium. The only use for amprolium is coccidiostat used to prevent coccidiosis; see, e.g., https://www.poultrymed.com/Amprolium. This proves that the coccidiostat for prevention of coccidiosis in Plaintiff's feed was deficient or ineffective. Plaintiff told Kyle with that amount of stress on such young birds, that next would be dermatitis, low feed conversion, low pay, etc and that Case had set him up to fail. Plaintiff was right.

65.     On June 1, 2020, Defendant Case manager Pat Moats came to Plaintiff Lutz' farm. When Plaintiff Lutz said he had difficulty hearing, Mr. Moats pushed an envelope into Plaintiff Lutz' chest, saying "we're terminating you; you can fucking read can't you? We'll be happy to work with whoever buys your farm after you lose it." See, Ex. "7". Pat Moats then immediately called Plaintiff's bank, Peoples Bank, and told Plaintiff's banker, Zach Dellinger, that Case was

cancelling the contract, and that People's Bank should probably foreclose and auction Plaintiff's farm.

66.     Since receiving the notice of termination, Plaintiff has attempted to secure mitigating contracts with the only other chicken aggregator in the area, Tyson.  Tyson, however, will not grow South of I-40, giving Case a complete monopoly and control.

67.     Plaintiff has spoken with other area farmers who report that it is widely known in the community that Case management became angry about them complaining (about Case's breaches of contract and animal welfare issues), and determined to make examples of them and "ruin them".

68.     Plaintiff Lutz's last flock left in June 2020.  Case's decision to terminate Plaintiff's contracts and cease sending flocks leaves Plaintiff with no means of paying his mortgage that he took out on their farm to build the chicken houses, including the homes of his families.

69.     Before Case stopped placing chicks on Plaintiff's farm, he had planned to operate broiler houses on their farms for at least thirty (30) years.

70.     Plaintiff has spoken with his banks, and been told that if he does not have a chicken contract, he will need to place his family farms up for sale as security for his loans.  The loss of family farms would be a crushing and irreparable harm for which no monetary recovery could ever compensate.

71.     Finally, on July 21, 2020, the United States Food and Drug Administration issued a Notice of Violation, attached as Exhibit "8", finding that Defendant Case has been in violation of the Packers and Stockyards Act continuously since July 2015, when it was informed that its contracts failed to comply with the Act.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff bring this action on behalf of a class, and subclass, defined as follows: (1) all Case growers who have signed contracts with Case since July 2015, including the "Case 2009 contract" signed by Plaintiff Lutz in 2013, and the Case "2016 contract" signed by Plaintiff Lutz in 2016; and (2) all Case growers since July 2015 who had their contracts terminated by Case under such illegal contracts.

73.     **Numerosity** (Fed. R. Civ. P. 23(a)(1)): The Class members are so numerous that joinder of all is impractical. Upon information and belief, Defendant has forced hundreds of growers to sign illegal contracts since July 2015 and terminated many, all of whose names and addresses are identifiable through documents maintained by Defendants.

74.     **Existence and Predominance of Common Questions of Law and Fact.** (Fed. R. Civ. P. 23(a)(2)): Common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members. The common legal and factual questions include:

> a.   Whether Defendant knowingly implemented a contract that they knew violated the Packers and Stockyards Act under coercive means.
>
> b.   Whether Defendant made knowingly false statements, including false financial projections, and false statements regarding term of contracts, in order to induce class Plaintiff to sign.
>
> c.   Whether Defendant violated the Packers and Stockyards Act and the North Carolina Unfair and Deceptive Trade Practices Act.
>
> d.   Whether Defendant exercised such complete domination and control of the "tournament" system whereby the same plaintiff class member exercising

22

the same husbandry practices could have his or her "performance" and income fluctuate wildly.

e. Whether Defendant engaged in a willful pattern of retaliation terminating the contracts of those plaintiff class growers who complained of wrongful treatment.

75. **Typicality** (Fed. R. Civ. P. 23(a)(3)): Plaintiff's claims are typical of the claims of each Class member. Plaintiff has the same claims for equitable relief and damages that they seek for absent Class members.

76. **Adequacy** (Fed. R. Civ. P. 23(a)(4)): Plaintiff is an adequate representative of the Class. His interests are aligned with, and not antagonistic to, the interest of the members of the Class they seek to represent, he have retained counsel competent in complex litigation and he intend to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Class.

77. **Predominance and Superiority**. (Fed. R. Civ. Pro. 23(b)(3): Questions of law and fact common to the Class members predominate over questions affecting only individual members and a class action is superior to other available methods for faire and efficient adjudication of the controversy. The equitable relief and liquidated damages sought by each member are the same. However, each Class member's damages may be limited, such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for the members of the Classes to individually redress effectively the wrongs done to them. Even if the members of the Classes could afford such individual litigation, it would be an unnecessary burden on the courts to require class members to file hundreds of individual lawsuits. Furthermore, individualized litigation presents the potential for inconsistent and contradictory judgments and

increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF PACKERS AND STOCKYARDS ACT**

69.     Plaintiff realleges and incorporates by reference in this claim the allegations contained in the preceding and subsequent paragraphs of this Complaint. Case used its power over the Plaintiff and decided to retaliate against Plaintiff because of repeated complaints to Case about supplying dead birds, supplying sick birds, supplying moldy feed, Case leaving feed bins open causing vermin and mold, Case giving them thousands of additional unscheduled chickens throwing off his weight and profit. Plaintiff's performance as a grower for Case has been consistently average or above average. Thus, neither his performance nor the operation of his farms could have been grounds for the Case's unlawful treatment of the Plaintiff.

78.     Case in Plaintiff's 2013 contract contained no arbitration provision, and in signing his 2016 contracts he could not take time to read it, nor consult with an attorney, were falsely told it was identical to his prior contract. He was not provided with a copy of the 2016 agreement at the time he signed it, and not until several years later. These were unlawful practices violating 7 USC § 197c(a).

79.     Plaintiff's 2016 contract in its arbitration provision did not give a reasonable period of time to remedy a breach of contract that could lead to contract termination. The 2016 contract provided for immediate termination "upon written notice for any reason". Neither the 2016 contract, nor his notice of termination letter, did not provide any reasonable time by which a breach

24

could be remedied, nor afford him any opportunity to rebut the allegation of a breach, rendering the 2016 agreement and the termination letter unlawful practices.  See, CFR § 201.217.

80.    The Arbitration provision of the 2016 agreement does not print in "bold conspicuous print: Right to Decline Arbitration".   The 2016 agreement do not disclose that the cost of filing fee for AAA Arbitration to Plaintiff, given the amounts of compensatory damages at issue, would be over $11,000.00, which they clearly do not have.

81.    The termination letter does not refer to any rights of appeal, or to rebut the allegations, or even direct Plaintiff to his rights to Arbitration.  This violates the Packers and Stockyards Act.

82.    The grounds given to Plaintiff for this unlawful treatment and breach of the terms of the 2016 Agreement was a pretext for the actual reason, which was to punish his own behalf and on behalf of similarly situated Case growers.

83.    The conduct described above constitutes unjustly discriminatory and deceptive practices by Case and its agents and employees, all in violation of the Packers & Stockyards Act, 7 U.S.C. § 192(a).

84.    The conduct described above resulted in Plaintiff and his fellow class members being subjected to undue and unreasonable prejudice, and disadvantage; all in violation of the Packers & Stockyards Act, 7 U.S.C. § 192(b).

85.    Case's breaches of its poultry growing arrangement with Plaintiff was without economic justification and thus, were in violation of the Packers and Stockyards Act, 7 U.S.C. § 192(b).

86.    Cases unconscionable contract with Plaintiff and the class, and termination letters to Plaintiff and the class, violate 7 U.S.C. § 192c.

87.     As a direct and proximate result of Case's violations, Plaintiff suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT II
## FRAUD

88.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

89.     Case managers Marvin Cumberland and Greg Chapman provided Plaintiff and other members of the class with knowingly false financial statements, and false statements about the term or length of the contracts, which they knew were false, and were presented to new growers sitting in their homes at their kitchen tables, of Plaintiff Lutz in 2013, and that he "would always grow for Case, because they would be there to help him."

90.     Case Marvin Cumberland and Greg Chapman repeatedly told Plaintiff at in 2013 and in 2014, that as long as he grew good birds, they would continue to receive placements of baby chicks from Case.

91.     Case managers' representations that they would continue to receive chickens was the primary inducement for Plaintiff to enter into the agreements with Case as well as expend funds to improve his chicken houses. A well- constructed poultry facility has a life span of approximately 30 years and Plaintiff needed at least fifteen (15) years just to pay off the indebtedness.

92.     Case managers knew that their representations to Plaintiff, that the financial projections provided were false, and that they would continue to receive chickens as long as they

grew good birds were false, and were intended to induce Plaintiff and class members to improve their facilities at their expense and to continue to contract with Case.

93.    Plaintiff reasonably relied on the false statements of Case managers Marvin Cumberland, Greg Chapman, Doug Hatley and Bradley Shore and did not know that the representations were false until receiving Case's termination letters, that chicks would not be arriving as contractually scheduled.

94.    Plaintiff reasonably relied on the Case managers' misrepresentations concerning the longevity of the relationship, and accuracy of financial projections showing that Plaintiff could, in fact, make profits in Case's "tournament system", and the promises from Case personnel that they would be placing chicks on his farms, to his detriment and did not know that the representations were false until Case informed him that they would not be placing chicks on his farm and subsequently failed to provide chicks.  To date Case continues to refuse to supply chicks to Plaintiff Lutz' farm.

95.    As a direct and proximate result of Case's intentional and willful fraud, Plaintiff suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT III
## BREACH OF CONTRACT

96.    Plaintiff re-alleges and incorporates by reference the allegations contained in the preceding paragraphs.

27

97.     Case deliberately and maliciously refused to honor the requirements of Plaintiff's contract to continue to place birds on Plaintiff's farm.  Case breached its contract with Plaintiff by deliberately dumping dead birds upon delivery, by delivering more birds than scheduled to throw off his weight/payments, and various other wrongful conduct identified above.

98.     As a direct and proximate result of Case's violations, Plaintiff suffered and incurred substantial damages. These damages include lost business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish, and other compensatory damages, in an amount to be determined by a jury and the Court.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

99.      Plaintiff re-alleges each and every allegation set forth above, and thereby incorporates same by reference, is if all were set forth fully herein.

100.    Plaintiff's contracts with Case, in 2013, and 2016, as well as the longstanding relationship between the parties contains an implied covenant of good faith and fair dealing that the parties would deal fairly and honestly with each other and would not do anything that would have the effect of destroying or injuring the right of the other party to receive the fruits of their agreements.

101.    Case intentionally took actions to destroy Plaintiff's business.  Defendant acted in bad faith by alleging baseless defaults, imposing arbitrary restrictions and obligations on Plaintiff, and intentionally manipulating Plaintiff's ranking in the tournament system, and falsely defaming Plaintiff to the entire community in a successful effort to destroy his ability to mitigate with another company.

102.     Case thereby breached its duty of good faith and fair dealing with Plaintiff by, inter alia, taking actions to destroy Plaintiff's business. As a direct and proximate result of the intentional wrongful acts of the Defendant and its agents, Plaintiff suffered damages and, if evicted from its property will suffer even more significant damages including but not limited to imminent loss of its property, loss of profits, loss of goodwill, attorneys' fees, and other legal expenses.

103.     As a result of the actions of Case have violated the implied covenant of good faith and fair dealing contained in the agreements as against Plaintiff herein, and as a result thereof, Plaintiff is entitled to his damages incurred.

104.     The foregoing actions were intentional, willful and wanton, and done toward Plaintiff with sufficient fraud, malice, and oppression to warrant the imposition of punitive damages against Case.

## COUNT V
## VIOLATION OF N.C.G.S. CHAPTER 75

105.     Plaintiff re-alleges each and every allegation set forth above, and thereby incorporates same by reference, is if all were set forth fully herein.

106.     Case's actions in connection with this matter violate the federal Packers an Stockyards Act of 1921, 7 USC § 191, et seq., each of which constitutes an unfair method of competition or unfair or deceptive act or practice (the "Unfair Trade Practices") in violation of Chapter 75 of the North Carolina General Statutes.

107.     Defendant Case's actions as stated herein constitute Unfair Trade Practices, which include, but are not limited to:

     a.   Case mispresented the opportunity for financial profits in inducing Plaintiff to enter into a grower contract relationship;

b. Case misrepresented its promise to continue to supply chicks and that Plaintiff could continue to raise birds for Case until they retired;

c. Case intentionally and in retaliation for Plaintiff's complaints of animal cruelty and mistreatment by Case, and Case's failure to perform under its contractual obligations, manipulated its "tournament system" by giving Plaintiff thousands of extra unscheduled birds that brought down his weight and ranking in the tournament;

d. Case misrepresented the legal terms of the 2013 and 2016 contracts, depriving them of the opportunity to read and review them before signing, telling them they "must sign right now", not giving copies at the time of signing;

e. Case's contracts violate the Packers and Stockyards Act, and are thus unfair trade practices, in that they do not provide Plaintiff with notice of alleged breach, right to cure much less even respond to notice of alleged breach, by not conspicuously and boldly identifying the right to reject arbitration or costs of arbitration, and by manipulating Plaintiff's ranking in the "tournament system";

f. By Case spreading false lies into the community in a deliberate (and successful) effort to destroy Plaintiff's reputation in the community in order to (successfully) destroy his ability to obtain mitigation chicken grower contracts with another company;

g. By retaliating against Plaintiff for his complaints to Case about animal welfare and humane treatment of animals by deliberately giving him substandard birds arriving dead at their farms, by manipulating contents of feed to cause damage

to Plaintiff's flocks, by feed truck drivers delivering moldy feed, and other methods and tactics of retaliation;

h.  Defendant Case otherwise engaged in unfair methods of competition or unfair or deceptive acts or practices in this matter;

i.  Such acts are in and affecting commerce; and

j.  Such acts are the direct and proximate cause of damages to Plaintiff.

108.  As Plaintiff's damages are a direct, foreseeable, and proximate result of Case's Unfair Trade Practices, Plaintiff is entitled to recover such damages, including treble damages/punitive damages and attorney's fees as set forth in Chapter 75 of the North Carolina General Statutes, in an amount to be determined at trial.

<u>COUNT VII</u>
<u>DECLARATORY JUDGMENT</u>

109.  Plaintiff re-alleges and incorporate by reference the allegations contained in the preceding paragraphs.

110.  Plaintiff's 2016 agreements with Defendant Case on its face violates the federal Packers and Stockyards Act and regulations and is invalid.

111.  Defendant Case's terminations of Plaintiff's 2016 agreements violates the federal Packers and Stockyards Act, and is invalid, null and void.

112.  Plaintiff seeks and is entitled to a declaration that Defendant Case's termination of contract letters are invalid, null and void.

113.  Plaintiff seeks and is entitled to a declaration reforming the 2016 contract into compliance and consistent with the federal Packers and Stockyards Act and regulations.

114.  Plaintiff seeks and is entitled to a declaration that the 2016 contract's arbitration provisions are invalid, null, and void as they violate the federal Packers and Stockyards Act and

31

regulations, and that Case cannot compel Plaintiff to arbitration in this matter, and that Plaintiff is entitled to a jury trial.

115.    Plaintiff seek injunctive relief barring Defendant from terminating any more contracts under the illegal 2016 contracts of any Case growers in North Carolina.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court award the following relief:

1.    To enter an Order certifying the proposed Class under Rule 23 and appointing Plaintiff and the undersigned counsel of record to represent the Class;

2.    Judgment declaring that, pursuant the contracts and federal law, Case's 2016 contract was illegal and violated the Packers and Stockyard Act, and that Case's terminations of contract were invalid, null and void;

3.    Temporary Restraining Order, Preliminary and Permanent Injunction compelling Defendant Case's specific performance to continue supplying birds under the 2016 contract, and barring Defendant from terminating any other contracts under the illegal 2016 contract during the pendency of this lawsuit;

4.    An award of compensatory, incidental, consequential, treble and/or punitive damages in an amount to be determined at the trial of this matter, in favor of Plaintiff and against Defendants;

5.    An award of pre- and post-judgment interest, attorneys' fees, expenses, costs, and disbursements pursuant to N.C. Gen. Stat. § 75-16 et seq. or other applicable law, against Defendant;

6.    To permanently enjoin Case, pursuant to the Packers and Stockyards Act, from implementing or terminating any contracts that violate the Act;

7.      A jury trial on all issues so triable; and

8.      Such other and further relief as the Court deems just and proper.

Dated:  August 6, 2020.                          POPE AYLWARD SWEENEY & STEPHENSON


                                         By    /s/ Jeremy A. Stephenson, Esq.
                                               Jeremy A. Stephenson (NC Bar 34623)
                                               jstephenson@passlawyers.com
                                               6701 Carmel Road, #105
                                               Charlotte, NC 28226
                                               Phone: 704 414 7301
                                               Fax: 704 759 8996
                                               Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CASE NO. 5:20-cv-103

DAVID LUTZ, on behalf of himself and all )
others similarly situated. )
)
Plaintiff, )
)
v. )
)
CASE FARMS, LLC, )
)
            Defendants. )

## VERIFICATION OF COMPLAINT

I, DAVID LUTZ, being over the age of 21, and of sound mind and competent to testify, having first been duly sworn and cautioned, state under oath as follows:

1. I am the plaintiff in this action.
2. I have read all of the paragraphs of the Complaint in this action.
3. All of the allegations in the Complaint in this action are true and correct to the absolute best of my knowledge, information and belief.
4. All records attached as exhibits to the Complaint are true and correct copies of business records kept and maintained in the usual course of my business as a chicken farmer, and photographs taken by me truly and accurately portraying the images shown.

DAVID LUTZ

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

Sworn to and subscribed before me
On this the 6th day of august , 2020.

NOTARY PUBLIC
My Commission Expires: 4-11-2023

[official stamp/seal]

RACHAEL A. DOUGAN
Notary Public
Mecklenburg
County
My Comm. Exp.
04-11-2023
NORTH CAROLINA

1319300v1