# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CIVIL ACTION NO. 5:20-CV-00103-KDB-DCK

| | |
|---|---|
| **DAVID LUTZ, on behalf of himself and all others similarly situated,**<br><br>Plaintiffs,<br><br>v.<br><br>**CASE FARMS, LLC,**<br><br>Defendant. | **ORDER** |

**THIS MATTER** is before the Court on Plaintiff David Lutz's ("Lutz") motion for a preliminary injunction and specific performance. (Doc. No. 3). Lutz is a chicken grower who, beginning in 2013, entered into a series of contracts with Defendant Case Farms, LLC ("Case") to raise chickens. He asks the Court to grant a preliminary injunction declaring Case's June 1, 2020 termination of his chicken grower contract null and void as violating the federal Packers and Stockyards Act ("PSA"), holding that the Arbitration provision in that contract is similarly invalid under the Act,[1] and returning the parties to the status quo as existed before Defendant's termination of Plaintiff's contract.

The Court has carefully reviewed the motion and considered the parties' briefs and exhibits and their arguments during the hearing on the motion held on August 27, 2020. For the reasons and under the terms explained below, the Court finds that Lutz has a likelihood of success that the

---

[1] Case has not moved for arbitration in this case and has confirmed to the Court in its brief that it does not intend to move for arbitration in this matter. (Doc. No. 6, at 17). Given Case's assurance that it will not move for arbitration, there is no need to declare that the arbitration provision is invalid under the PSA at this time in the litigation.

1

termination of the contract is unlawful under the PSA and is otherwise entitled to injunctive relief to restore the parties to their relationship before the termination. Accordingly, the Court will grant Lutz's motion for preliminary injunction and order Case to continue its contractual relationship with Lutz in good faith under their 2016 contracts as if those contracts had not been terminated.

## I. RELEVANT BACKGROUND

From May 2013 to June 2020, Lutz was a contract chicken grower who accepted flocks of chickens owned by Case under consignment to manage, care for, and raise the chickens for Case pursuant to a Broiler Production Agreement ("Production Agreement") and New Case Farms Broiler House Supplement Agreement ("Supplement Agreement"). Lutz entered into his first contract with Case on May 6, 2013. He took out loans on his family farm to build four broiler houses to Case's specifications. On October 6, 2016, Lutz entered into a new Production Agreement and Supplement Agreement, (collectively, the "Agreements"), taking out more loans to build two more chicken houses in reliance on Case's alleged promises (1) that he would have more cash flow with more houses, and (2) that he could continue to raise chickens for Case until he retired. The 2016 Agreements were to last for a period of twelve years.

The Production Agreement describes Case's duties as follows: it will consign flocks of chickens to Lutz; furnish and deliver feed to Lutz as needed; furnish and deliver to Lutz the medications, vaccinations, and other materials determined to be necessary by Case for the production of chicks consigned to Lutz; be responsible for catching and the movement of each flock; provide service representatives/technicians to visit Lutz periodically to advise and offer technical assistance; and compensate Lutz in the manner agreed to by the parties.

In exchange, Lutz agreed to accept, manage, care for, and raise the chickens for Case; provide housing, equipment, supplies to maintain equipment, sanitation supplies, litter, heating fuel,

2

utilities, and labor to feed, water, care for, and manage and look after the flock; maintain such housing and equipment in operable condition and good repair; notify Case if any chickens do not develop normally, if there is any disease or parasitism noticeable within the flock, or if there is any situation that would have an adverse effect on the health or well-being of the flock; keep mortality records and all other records necessary for the efficient and proper care of each flock as directed by Case; provide for prompt disposal of all dead birds and cull birds in accordance with governing codes and regulations; provide and keep an operable alarm system approved by Case Farms to monitor the ventilation system and room temperature levels; and maintain in a sanitary manner all items provided by Case Farms for the purpose of biosecurity protection.

The Production Agreement further states:

> This agreement may be terminated by either party by written notice to the other in the event of any default by the other party. Any such termination shall not relieve the defaulting party of any liability to the other as a result of any default hereunder occurring prior to termination. Either party may terminate this agreement at any time for any reason provided that written notice be given to the other party no later than 10 days after the movement of a flock and prior to the placement of the next flock; provided however, that if Case Farms LLC has executed a New House Producer Agreement with Producer, it may not terminate this agreement unless Producer defaults in his/her obligations under this Agreement.

(Doc. No. 1-5, at 3, ¶ H). The Production Agreement describes "neglect that endangers the health or welfare of Case's chickens and failure to comply with any provisions of the Agreements, including but not limited to compliance with all environmental and litter management laws, rules, regulations, and ordinances, and all requirements and programs contained in the Agreement" as events of default by a grower that "can result in termination of the Agreement." *Id.* at 3, ¶¶ I.c, I.g.

The facts leading up to the termination of the Agreements are disputed. Lutz says that Case retaliated against him after he complained to Case about animal welfare issues, such as poor feed and animal cruelty, at the end of 2019. Specifically, Lutz alleges that Case failed to provide needed

3

medication for the chickens, deliberately weighed the chickens inaccurately so as to result in financial loss to him, delivered already dead chickens and chickens in such a poor condition that they could not survive, and assigned him a technician who deliberately misled him when he tried to ask questions and comply with Case's requests.

Case claims that it was Lutz who neglected the chickens on his farm and refused to take corrective action to better the chickens' health and welfare. Specifically, Case alleges that Lutz routinely failed to adjust the feeders and drinkers, resulting in the chickens not having the proper nutrition and hydration, failed to monitor and adjust the ambient air temperatures and air quality (ammonia) levels, failed to pick up dead birds, and failed to correct wet conditions on the floor of the houses.

On February 26, 2020, Case sent Lutz a letter informing him that he was in breach of his Production Agreement for failing to call his service technician when his chicken mortality rates exceeded a certain number. (Doc. No. 1-6). The letter described this as an "animal welfare" problem and instructed Lutz to "cure the above-referenced default by immediately and continuously complying with all aspects of the Animal Welfare Program, specifically the requirement to notify Case Farms of excessive mortality rates." *Id.* Lutz was warned that if he failed to cure, his Production Agreement would "be terminated effective 90 days from the date of this letter." *Id.* On June 1, 2020, more than 90 days later, Case issued a second letter to Lutz terminating the 2016 Agreement "effective immediately" due to his alleged failure to cure the default by "immediately and continuously complying with all aspects of the Animal Welfare Program." (Doc. No. 6-2).

Lutz filed a Verified Complaint initiating this action on August 6, 2020. He alleges violation of the PSA as well as claims for fraud, breach of contract, breach of an implied covenant of good

4

faith and fair dealing, and unfair and deceptive trade practices under North Carolina law. Lutz filed this motion for a preliminary injunction on August 10, 2020, claiming that without his contract with Case, he has no means of paying the mortgage he took out on his family farm and is at serious risk of losing the farm. He requests that the Court issue a preliminary injunction requiring Case to comply with the Agreements during the pendency of this lawsuit.

## II. LEGAL STANDARD

The standard for granting a preliminary injunction is well established. *See Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States*, 354 F. Supp. 3d 690, 693 (E.D. Va. 2018); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009) ("Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by 'a clear showing' that, among other things, it is likely to succeed on the merits at trial."). Every order granting an injunction and every restraining order must: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. Pro. 65(d)(1).

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and may never be awarded "as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24, 32 (2008) (noting that even issuance of a permanent injunction after trial "is a matter of equitable discretion; it does not follow from success on the merits as a matter of right."). The Fourth Circuit has similarly recognized that the grant of such a remedy involves "the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc).

In order to receive an injunction prior to a final decision on the merits, a plaintiff must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in his favor; and (4) the injunction is in the public interest. *Winter*, 555 U.S. at 20; *Mountain Valley Pipeline, LLC v. Western Pocahontas Properties Limited Partnership*, 918 F.3d 353 (4th Cir. 2019); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). Each of these four requirements must be satisfied. *Id*. However, movants "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir.2013).

### III. DISCUSSION

As a threshold matter, Case argues that "Plaintiff may not seek a mandatory injunction for specific performance of a contract that it is asking the Court to declare illegal." (Doc. No. 6, at 14). While Lutz's Complaint states that he seeks a declaratory judgment that the Agreements violate the PSA and accompanying regulations and are, therefore, "invalid," (Doc. No. 1, ¶ 111), he clarifies this statement by also seeking "a declaration reforming the 2016 contract into compliance and consistent with the federal [PSA] and regulations." (Doc. No. 1, ¶ 113). Thus, rather than seeking to totally invalidate the Agreements, the Court reads Lutz's Complaint to instead seek enforcement of the Agreements, but only to the extent that they do not violate the PSA.[2]

Lutz's claim in this case thus stands in contrast to the claims in *Omega World Travel, Inc., v. Trans World Airlines*, 111 F.3d 14, 15-16 (4th Cir. 1997), which Case cites to support its proposition that Lutz cannot seek inconsistent remedies. The plaintiff in *Omega World Travel*

---

[2] Lutz explained at oral argument that Case knew that certain provisions in the 2016 Agreements violate the PSA, but nevertheless still "pushed out" the contracts to many of its growers. He contends that by pushing out contracts Case knew to be in violation of federal law, Case committed an unfair and deceptive trade practice. Thus, the invalidity of certain provisions of the 2016 Agreements is relevant to that claim as well.

6

requested in its complaint that the court declare a contract illegal and void, yet subsequently filed a motion for a preliminary injunction seeking specific performance of the contract. The Fourth Circuit found the requests to be inconsistent and refused to enter a preliminary injunction stating, "When the injury that the movant seeks to prevent through a preliminary injunction is not only unrelated, but directly contradictory to, the injury for which it seeks redress in the underlying complaint, then a preliminary injunction simply should not issue." 111 F.3d at 16. Here, because Lutz seeks enforcement of the Agreements to the extent they do not violate the PSA, Lutz's request for a preliminary injunction is not inconsistent with the relief he requests in his Complaint.

The Court now turns to the four requirements a plaintiff must show to obtain a preliminary injunction: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in his favor; and (4) the injunction is in the public interest. *Winter*, 555 U.S. at 20.

>  i.  *Likelihood of Success on the Merits*

Lutz argues that Case did not terminate the Agreements in compliance with federal law and its termination letter is thus, "invalid, null, and void." (Doc. No. 3-1, at 16). Without a proper termination, the contract indisputably required Case to send Lutz chickens in June 2020. Thus, Lutz claims that Case's failure to send those chickens constitutes breach of contract. (Doc. No. 3-1, at 17). Case argues that it complied with the federal regulations, that the termination was valid, and that it therefore did not breach the contract by failing to provide chickens in June 2020. In sum, Lutz's likelihood of success on his contract claim turns on the validity of Case's termination of the contract.

The regulations implementing the PSA are found at 9 C.F.R. Part 201-206. Under 9 C.F.R. § 201.100(h), a dealer ending a poultry growing arrangement is required to give the grower written termination notice at least 90 days prior to the termination. The regulation reads:

> (h) Written termination notice; furnishing, contents.
>
> (1) A live poultry dealer that ends a poultry growing arrangement with a poultry grower due to a termination, non-renewal, or expiration and subsequent non-replacement of a poultry growing arrangement shall provide the poultry grower with *a written termination notice at least 90 days prior to the termination of the poultry growing arrangement.* Written notice issued to a poultry grower by a live poultry dealer regarding termination shall contain the following:
>
>> (i) The reason(s) for termination;
>>
>> (ii) When the termination is effective; and
>>
>> (iii) Appeal rights, if any, that a poultry grower may have with the live poultry dealer.
>
> (2) A live poultry dealer's poultry growing arrangement with a poultry grower shall also provide the poultry grower with the opportunity to terminate its poultry growing arrangement in writing at least 90 days prior to the termination of the poultry growing arrangement.

9 C.F.R. § 201.100(h) (emphasis added).

The Regulations also require a poultry dealer to provide a poultry grower with a reasonable time to remedy a breach of contract:

> The Secretary may consider various criteria when determining whether a packer, swine contractor or live poultry dealer has provided a poultry grower or swine production contract grower a reasonable period of time to remedy a breach of contract that could lead to contract termination. These criteria do not limit a packer, swine contractor or live poultry dealer's rights under a contract or agreement where food safety or animal welfare is concerned. These criteria, include, but are not limited to:
>
> (a) Whether the packer, swine contractor or live poultry dealer provided written notice of the breach of contract to the poultry grower or swine production contract grower upon initial discovery of that breach of contract if the packer, swine contractor or live poultry dealer intends to take an adverse action, including termination of a contract, against the poultry grower or swine production contract grower based on that breach of contract by the poultry grower or swine production contract grower;

8

(b) Whether the notice in paragraph (a) of this section includes the following:

(1) A description of the act or omission believed to constitute a breach of contract, including identification of the section of the contract believed to have been breached;

(2) The date of the breach;

(3) The means by which the poultry grower or swine production contract grower can satisfactorily remedy the breach, if possible, based on the nature of the breach; and

(4) A date that provides a reasonable time, based on the nature of the breach, by which the breach must be remedied.

(c) Whether the packer, swine contractor or live poultry dealer took into account the poultry grower's or swine production contract grower's ongoing responsibilities related to the raising and handling of the poultry or swine under their care when establishing the date by which a breach should be remedied; and

(d) Whether the poultry grower or swine production contract grower was afforded adequate time from the date of the notice of the alleged breach to rebut the allegation of a breach.

9 C.F.R. § 201.217.

Lutz argues that the June 1 letter from Case was the termination letter and that it fails to satisfy the PSA because it did not provide him with 90 days' notice, as required by 9 C.F.R. § 201.100(h). He characterizes the February 26 letter as a "warning" letter rather than a termination letter. As Lutz submitted at oral argument, these two regulations (and Case's two letters) serve distinct purposes. First, Section 201.100(h) requiring 90 days' notice of termination provides "a level of certainty letting the farmer know that he has to find a mitigating source of income."[3] Second, Section 201.217 requires a dealer to provide a grower with a reasonable period of time (depending on the circumstances) to cure any alleged breach. The purposes served by these regulations are different: merely giving a time to cure does not provide the same certainty that a notice of termination is designed to provide. Rather, the intent of the cure period is to allow a grower an

---

[3] *See* rough Transcript of the hearing on August 27, 2020.

opportunity to *avoid* a termination of his contract. Indeed, Section 201.217 specifically states that a live poultry dealer must provide a poultry grower with "a reasonable period of time to remedy a breach of contract *that could lead to contract termination*." This language further supports a reading that a cure period and the 90 days' notice of termination are two separate time periods.

Case contends that it is exempt from the 90 days' notice of termination requirement in Section 201.100(h) because the Agreements were terminated based on "animal welfare" issues. (Doc. No. 6, at 19). In support of its argument, Case cites to the following clause in Section 201.217: "These criteria do not limit a packer, swine contractor or live poultry dealer's rights under a contract or agreement where food safety or animal welfare is concerned." However, this clause exempts a live poultry dealer only from providing a "reasonable time to cure" if there are animal welfare issues; it does not similarly exempt a poultry dealer from providing 90 days' notice of termination as required under the separate termination regulation, Section 201.100(h).[4] As discussed above, the two regulations impose independent obligations on the dealer.

---

[4] At oral argument, Case also cited to 76 F.R. 76874-01 in an attempt to persuade the Court that the 90 days' notice of termination in Section 201.100(h) does not apply when animal welfare is concerned. That section of the Federal Register addresses certain comments made on the PSA. In response to comments that Section 201.217 did not allow for immediate termination if the grower failed to comply with the internal food safety or animal welfare requirements, the agency responded that it agreed with the comments and added a sentence to the introductory paragraph of Section 201.217 that would allow the terms of a contract to control when food safety or animal welfare is at stake. However, the Court does not find this history persuasive.

The "animal welfare" exception is plainly contained in the section titled "Reasonable period of time to remedy a breach of contract," and the sentence added by the agency states that "*these criteria*" do not limit a live poultry dealer's rights under a contract or agreement where food safety or animal welfare is concerned. "These criteria" refers to the following criteria in Section 201.217 that the Secretary is to consider when determining whether a live poultry dealer provided a poultry grower a reasonable period of time to remedy a breach of contract that could lead to contract termination. Thus, the plain language of the regulation suggests that the animal welfare exception only applies to providing a reasonable cure period, not the separate termination regulation in which the same "animal welfare" exception is not found.

Additionally, both the February 26 letter and the June 1 letters imply that failure to comply with *any* part of Case's Animal Welfare Program constitutes an animal welfare issue. However, Case's Animal Welfare Program is a lengthy (83-page), detailed document that includes numerous requirements and reads very much like an operation manual. (Doc. No. 6-2, at 20-30). For example, Section 8.3.11.6 of the Animal Welfare Program requires that each live grower maintain an up to date emergency contact list that must be properly displayed in at least one poultry house. Other sections require that all feeding and drinking systems be checked for proper operation on a daily basis, require that feed intake and water consumption be monitored, and outline a detailed step-by-step guide to brooding young chicks. *Id.* (Sections 8.3.12.4; 8.3.12.5; 8.3.13.3). If animal welfare means what Case says (the entirety of the Animal Welfare Program), it would effectively nullify the cure period protected by Section 201.217, as well as the 90 days' notice requirement in Section 201.100(h) (assuming that it provided for an animal welfare exception, which it does not). While "animal welfare" will of course manifest in many operational requirements, the real focus of that phrase in the regulation is on humane (as distinguished from effective and profitable) treatment of the animals, as even Case emphasizes in the Animal Welfare Program. *See* (Doc. No. 6-2, at 30) ("In-humane, cruel and unethical behavior of poultry stock will not be tolerated."). Extending the term "animal welfare" to include compliance with every part of Case's Animal Welfare Program as argued by Case thus extends the "animal welfare" exception in Section 201.217 further than it was intended to go.

Case also argues that, even if it was not exempt from the 90 days' notice of termination requirement in 201.100(h), the February 26 letter was itself a "notice of termination" that provided Lutz with the requisite 90 days' notice. Case's position, however, is contradicted by both the language in the February 26 letter and Case's actions following the letter. First, the letter states,

11

"This letter serves as your *notice to cure* the above-referenced default by immediately and continuously complying with all aspects of the Animal Welfare Program . . . ." (Doc. No. 6-2) (emphasis added). Therefore, by its terms the February 26 letter provided Lutz with a "cure" period rather than notifying him of an already decided termination.[5] Second, Case sent the June 1 letter terminating Lutz 96 days after the February 26 letter. If in fact the February 26 letter had indeed been an actual notice of termination rather than a "warning/cure" letter, then Case's second letter would have been sent 90 days following February 26, or at a minimum would have been effective 90 days later. The timing of Case's June 1 letter, terminating Lutz a short time after the cure period expired, is thus consistent with the conclusion that it was only in the June 1 letter that Case notified Lutz of his actual termination.

The Court also notes that on July 21, 2020, the United States Department of Agriculture issued a "Notice of Violation" letter informing Case that a similar producer agreement contract used with another grower, Stephen Parker,[6] in Morganton, North Carolina was in violation of the PSA. Among other violations, the Notice cited Case for unlawfully terminating its contract with Mr. Parker by not providing the required 90 days written notice of termination in violation of 9 C.F.R. § 201.100(h) and including a deficient arbitration clause that violates Section 210 of the PSA and 9 C.F.R. § 201.218 in several ways.

---

[5] Lutz argues in his brief that he was not given a reasonable time to cure any breach as required under Section 201.217. However, the February 26 letter gave Lutz 90 days to cure the alleged breach. He has not explained how the description in the February 26 letter, or the 90 days given to cure, are unreasonable under Section 201.217. Thus, the Court finds that Lutz has not shown a likelihood of success on his argument that Case breached the contract by failing to give him a reasonable time to cure (although it is also unclear from the record whether or not Lutz did cure the specific problem identified in the February 26 letter, the alleged failure to notify Case when chicken mortality reached a particular level).

[6] Mr. Parker is a plaintiff in a similar case pending in this Court, Case No. 1:20-CV-11.

12

Case 5:20-cv-00103-KDB-DCK   Document 14   Filed 08/31/20   Page 12 of 16

In summary, notwithstanding the "at will/10 day" termination procedures included in the 2016 Agreements, a proper termination of a chicken grower under the PSA must comply with the governing law and regulations. Allowing otherwise would improperly allow parties to contract around compliance with federal law and regulations. As discussed above, the Court finds that Case did not give Lutz the required 90 days' notice of termination. Absent a lawful termination, Case breached the 2016 Agreements when it did not deliver a new flock to Lutz in June 2020. Thus, the Court finds that Lutz has shown a likelihood of success on the merits that Case's termination was unlawful and that it breached the contract by failing to provide a new flock in June 2020.

    *ii.* *Irreparable Harm*

With respect to his second required element, Lutz has shown that "irreparable injury is likely in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 375-76 (2008). In his Verified Complaint, Lutz states that the farm has been in his family since 1957 and is currently home to not only himself, but his two daughters and their families, including his grandchildren. (Doc. No. 1, ¶ 30). Moreover, Lutz claims that he has attempted to secure another contract with a different chicken supplier but has been unable to do so. Lutz declares that he is likely to lose his family farm if a preliminary injunction is not issued. The current balance on his farm loans is $922,486.14. (Doc. No. 11-1, David Lutz Affidavit, ¶ 23). He has a "once-per year annual payment of $150,157.02" due on December 31, 2020. *Id.* Without a chicken contract, Lutz says he will have to place his family farm up for sale to pay his loans. His loans are budgeted based upon receiving 4.5 flocks of chickens per year; without chickens from June 1 through August 2020, he has already lost close to a quarter of his annual revenue. *Id.*

Unless reinstated as a grower with Case, Lutz will likely be forced to sell his family farm, lose his home and his children and grandchildren's homes, and lose his poultry business which he has

13

spent years growing. *See Baldree v. Cargill, Inc.*, 758 F. Supp. 704, 706-07 (M.D. Fla. 1990) (finding plaintiffs had made a sufficient showing of irreparable harm when "[u]nless reinstated as a Grower, [plaintiff] will be forced to sell his farm and he will, therefore, lose his home and his land (which have been in his family since 1902). Further, [plaintiff's] longstanding 21-year poultry business which he and his family built through personal sacrifice will be destroyed."). Accordingly, the Court finds that Lutz has shown that he will suffer irreparable harm without the injunction.

### iii. Balance of the Equities

The balance of equities likewise tips in Lutz's favor. As discussed above, Lutz has demonstrated that he will lose his family farm if an injunction does not issue. Case claims that if it is forced to continue working with Lutz, it will be exposed to monetary damages and "irreparable loss of reputation and goodwill that could jeopardize its viability as a company." (Doc. No. 6, at 22). However, the Court finds that Case's histrionic and speculative forecast of monetary loss or a potential loss to Case's reputation threatening its very viability is less egregious than the nearly certain catastrophic harm Lutz will suffer if he loses his farm and livelihood. While Case may suffer some financial harm, an injunction will simply require that it continue working with Lutz rather than another grower and Case will likely continue to make money off of Lutz's chickens. Also, not only will Lutz lose his home and livelihood, but Lutz's family, who also lives on the farm, will lose their homes. Thus, the Court finds that the balance of the equities favors Lutz.

### iv. Public Interest

Finally, the Court finds that a preliminary injunction on the terms entered by the Court is in the public interest. The PSA clearly expresses a public policy to protect farmers like Lutz from abusive practices by poultry dealers, who have far more leverage and economic power. This

14

includes preventing dealers like Case from abruptly and without notice terminating contracts of family farmers like Lutz, as evidenced by 9 C.F.R. §§ 201.100(h), 201.217. Therefore, the public interest is best served by enforcing the regulation requiring 90 days' notice of written terminations by poultry dealers.

  *v.* *Security for the Preliminary Injunction*

Under Rule 65(c), a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." This includes, in appropriate circumstances, waiving the requirement altogether. *See Pashby v. Delia*, 709 F.3d 307, 331-32 (4th Cir. 2013). "The burden of establishing the bond amount rests with the party to be restrained." *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015). In setting the bond, a court should consider the potential loss to the restrained party if wrongfully restrained. *Id.*

Lutz asks the Court not to set a bond in this case because he lacks the resources to post a significant bond. Case asks the Court to set a bond of $1,000,000, although its alleged monetary losses are speculative as it may well profit rather than lose money from continuing to work with Lutz. Accordingly, the Court will initially require only a nominal bond of $1,000, without prejudice to a future motion by Case to increase the bond amount based upon good cause shown.

## IV. ORDER

**IT IS THEREFORE ORDERED** that:

 **(1)** Lutz's Motion for Preliminary Injunction, (Doc. No. 3), is **GRANTED.** Case is enjoined from enforcing its June 1, 2020 termination of Lutz and the parties are ordered to operate their business relationship under the 2016 Agreements in good faith, to the extent they do not violate federal law, as if the termination had not occurred; and

15

Case 5:20-cv-00103-KDB-DCK   Document 14   Filed 08/31/20   Page 15 of 16

**(2)** Lutz shall post a bond in the amount of $1,000 for the payment of such costs and damages as may be incurred or suffered by Case if it is later found that Case was wrongfully enjoined or restrained by this Order; and

**(3)** The parties are ordered to conduct a mediation of their dispute within 60 days of the issuance of this Order.

**SO ORDERED.**

Signed: August 31, 2020

Kenneth D. Bell
United States District Judge